Case number 17-1237NL. Mek Arden, LLC, BBA, Arden Post Acute Rehab Petitioner v. National Labor Relations Board. Mr. Baskin for the Petitioner, Mr. Iwasik for the Respondent. It's right on the courtroom here. We've lost a lot of the audience, but we're here. Thank you, Your Honor. Maurice Baskin, representing the Petitioner, Arden, and the first issue in this labor law case is about the following simple greeting, how are things going? This is one of the most common greetings in the English language, but the National Labor Relations Board held for the first time ever, we believe, and I'm always cautious about saying that, about 80 years of precedent. But we haven't found another case like it where the Board has said that phrase, how are things going, is a solicitation, an unlawful solicitation of greetings. Neither has the Board. They certainly did not cite one. The ALJ cited the closest case to this and said best plumbing, in which the phrase used was what's going on, was not a solicitation. The Board did not address best plumbing, did not address the ALJ ruling on that fact. Instead, the Board said, well, the ALJ did not follow this test that the Board had created in the Maple Grove case for unlawful solicitation. But Maple Grove said nothing about what actually constitutes a solicitation. In Maple Grove, there was a very obvious concern. Let me call your attention to the transcript, because I specifically looked this up this I don't remember which one it is, but on page JA-98, she testified that the CEO, she was asked, now, do you recall if there was any discussion about the union? She said, he asked, he just said, I hear that, you know, some of us is trying to form a union. And I said, I don't want to talk about that. And then he just said, that must mean yes, and we ended the conversation. He says on page JA-190, I had, didn't ask her about the union. I made a statement at the end of the conversation that I had heard rumors that there's rumors about the union. And then she responded that she didn't want to talk about that. So he even admits that he asked her about the union. He asked her about the union after the initial greeting. What's important about what you just described, the conflict there, is that the judge credited President Mettler's version of the event, that the statement, how are things going, came first. It's a greeting. In the board's brief and in the union's brief, they try to reverse the order and say, oh, well, he brought up the union first and only then said, how are things going. But that's not what the judge credited, and that's what the board is bound by. The board did not disagree with the judge on that, and as our view. But if he'd stopped at how are things going, it would have made a difference. So the order, I don't think, was all that important. Well, I would submit that the only solicitation part of this is the how are things going. Then she opens up. She has a lot on her mind. She had already made a complaint. So that's another issue of how can it be a solicitation when she's already made a public complaint, and only at the end does he say the phrase about something about the union. No further discussion. The conversation ends. So that's not part of the solicitation. The solicitation, the only possible claim of the solicitation is that how are things going is somehow solicitation more than a greeting, which is what it really is. But there's a factual context here. We have the chief operations officer who does not visit this facility every day showing up during the most active time of the organizing campaign and seeking out somebody who he understands has some concerns, and in the same conversation in which he's asked her and said I hear there's some concern about how things are going. Tell me why you think the exact sequence within this conversation is dispositive. Well, let's take a starting point. Management in a union organizing campaign is allowed to talk to its employees as long as they don't interfere with their rights, as long as they don't solicit and promise to remedy a grievance. So it is entirely understandable. In fact, that's what management is supposed to do. Employees are unhappy, supposed to talk to them. Just don't do the prohibited thing. So if he went to talk to someone who had publicly complained already and tried to engage her about the union discussion, there's nothing at all wrong with that. There's no allegation that there's anything wrong with it. And there's a lot of issues in this case in which the general counsel filed a complaint that said one thing, and then the board tried to turn it around and say, well, that wasn't pled properly, but we're going to find you guilty of something else. On this one, the sole allegation is that the president of the company impliedly promised a remedy by soliciting a grievance. So if there's no solicitation, he hasn't done anything wrong. And that's why the order is so important. The only thing that is arguably a solicitation, it's the only thing that's even a question, is how are things going? And so it's like saying, someone says, how are you? And I say, how are you? I'm not asking for your medical history. In common English parlance, how are things going is not a question, or it's a rhetorical question at most. It is a greeting. It's a way to start the conversation, which is why it is important as to what the sequence is. If it was in reverse order, then if he had said there's something going on, here's something going on about the union, and how are things going relating to that, one could make some sort of argument against our interests. But that's not what's been credited. It does seem like it puts the employer in a little bit of a restrained position because, you know, the management should be offering to fix things. But under Maple Grove, it sounds like the board views it's not even the solicitation that's key. It's the promise to remedy the concerns. And so, which is, I think, why we were probing a little bit on the order of, you know, why you thought that was important. Because it seems like in this particular window of time, coming in from headquarters and saying, we've got this, we'll go look into it, is actually something that is not permitted under the labor law. Do you disagree? I would strongly disagree. First, since it's been mentioned a couple of times that he's not a regular visitor, actually, the testimony is that he visits the facility several times a month, and that he was there to deal with a successful survey, which is undisputed testimony, and that he spoke to her as someone who's But he visited this facility several times a month? I didn't see that. Do you have a cite for that? Yes, because I looked it up myself this morning. It's in the testimony of Mr. I'll have to get it to you on the rebuttal. It's in the testimony of Mr. Mettler, President Mettler, and there is an exhibit actually introduced surrounding that testimony, which gives his schedule. That he visited this facility. Yes. Yes. And then there was a discussion about a gap after June 25th because he had a medical procedure was the only reason he missed some time afterwards. So, yes, that is the testimony. He's not, although in the end, it doesn't really matter. Any management official could have had this conversation, whether present or not. It's not something that the board relied on as the basis. The board relied on, and you are bound, and you should make your ruling based on what the board considered and decided, not on what general counsel is arguing, and not on the order that they would wish it happened in. But what the board said is he had, he gave this, started with how are things going, and then she answered raising something she had already said, and then at the end he said something about a union, and she said I'm not talking about that. Conversation ended, which implies that she wasn't talking about that beforehand. It makes a pretty big difference about this order. But it also makes, words matter. And the board has precedent about what constitutes solicitation. Maple Grove is a two-step test. As you alluded, they are concerned about the promise to remedy. They failed on that, too. He didn't say he was going to fix anything. He said he was going to look into it, which the judge and the dissent both said, well, that's just a routine, like, what else is he supposed to do, stand still? The board's answer was, well, he should have said thank you for the information. Well, how would anyone know that that's the magic formula? Because that sounds like you're exchanging a benefit of some kind by taking that information. The reality is none of this happens if the board does not exceed its previous precedence and declare a commonplace greeting to be a solicitation. I would add that the, as I think I've already said, she's, this woman had previously made the same open complaint. It was not a secret. It was not something that could be solicited. The same greeting was made to two other employees who were not in the bargaining unit, which establishes past practice, which is, the board said, has said in other contexts is supposed to be important. So for all of these reasons, and I'll just throw in one other item, which is that nothing else, this makes a de minimis case of solicitation. And the board studiously ignored the de minimis doctrine as to a number of the complaints alleged in this situation. The board's own precedent of yellow transport has said that when there's no harm done in an 8A1 situation, and clearly this was the lead union organizer or one of them, and not only was she not intimidated or coerced in any way, they filed the petition right after this conversation. Can you focus on your request for a remand in light of Boeing? Certainly. The Boeing case came out. We know the administrative law judge cited repeatedly the Lutheran Heritage Village case and doctrine, and Boeing overruled Lutheran Heritage. Not in full, though. As I understand it, it spoke to that first factor of the three. That's correct. But to parse out what parts of the judge's decision were valid, under Boeing, should be the job of the board. And that should be your job under the food store case of the Supreme Court to send it back to the board on those at least on those particular allegations. It has to do with the one about instructing employees to stay in their work areas and the directive about not wearing union scrubs primarily. But directing employees not to wear union scrubs is, on its face, union-related or, you know, suppressing union expression. And, therefore, it's not facially neutral under Boeing's definition. Actually, it could be interpreted as facially neutral. Explain that. Because it's wearing something other than the approved uniform, a different color in a health care facility where patients are wondering, you know, trying to make out often who is in charge and who is at which level of health care. But I thought the ALJ's findings included findings that there wasn't a ban on logoed garb, that it was just that they said take off those union scrubs. So if you had a general policy that said, you know, only uniform, our uniform, no logos, I could see that as not as facially neutral within the terms of Lutheran Heritage and or Boeing. But that would be an argument. But to decide to divorce that argument from Lutheran Heritage with the overlay of Boeing is, well, a step too far. It's what's the board that's the board's job. The board has changed the law. That change has remarkable implications. But not on that point. Not on the point of whether something's facially neutral or not. Yes, but, well, I don't think it's that clear, frankly, how Boeing's been interpreted. In fact, the board just in the past two weeks has remanded a host of cases that were pending that have been decided by administrative law judges on every kind of work rule, several dozen, which shows that the board itself thinks that everything needs to be revisited, factually, including this. And I just want to add, that's an important point, and we can't get to the other five allegations, but I would reiterate what we said in the brief about your Bellagio case and the impact that has on several allegations in which the complaint was found by the judge to not have been proven, and yet, without fair notice to the employer, was turned around, including on the posting of the pro-union flyers, including another scrubs situation with Andre the janitor, in which a totally new theory was adopted, one that had not been charged against the company, and the company had no ability to realize that they were being sandbagged in this way. I want to reserve some time for rebuttal, and I appreciate your time. Thank you. All right. Mr. Iwasek. Thank you, Your Honors, and may it please the Court. My name is Craig Iwasek, and I'm here representing the National Labor Relations Board. As a preliminary matter, I'd like to say that. Can you bring that mic up a little bit? Yes, of course. Thank you. Is that better? As a preliminary matter, I'd like to say, with regard to the Boeing remand issue, over the past few months, the Board has issued subsequent Boeing decisions that have made expressly clear, if it wasn't clear from the Boeing decision itself, that the remaining two prongs of Lutheran heritage have remained intact, in spite of Boeing. And I can provide citations for that, but just as a quote, it makes clear that Boeing overruled the reasonably construed prong, but not the promulgated and response prong of Lutheran heritage. So there are three cases that have come down this summer that basically affirm the Board's position on the limitation of the Boeing ruling vis-à-vis Lutheran heritage. Going to the solicitation grievance, I think Judge Pillard's, building on Judge Pillard's comments, the important thing here was that the Board found that this was not simply an exchange of pleasantries under these facts, under these circumstances. Opposing counsel is correct that the Board found that the order was that Marcus Pillard's prongs are going. If the brief created any confusion about that, I apologize. But that is what the Board found. But the sequence would not have mattered. The Board's position was that if you have a high-ranking official, this was the chief operating officer of Meck-Arden's corporate parent, flying in from out of town, approaching a certified nursing assistant, a low-level employee, but one of the two main union organizers, approaching her on the floor when he normally does not do so and has no – there's no history of past practice of having done so, and asks her how things are going, also asks her about the union, and then thanks her and says that he will look into her complaints. On those facts, this was a solicitation. It's not the case that an employer could not ask an employee how things are going, and that would be necessarily unlawful. There are plenty of cases where an employer, usually a lower-level supervisor, does in fact have the past practice of being more gregarious, being more inquisitive about how things are going with their employees. And in those cases, there were no solicitations found. But here, in light of these unusual circumstances, in light of the fact that this was the beginning of a union organization drive, on those facts, there was an unlawful solicitation. With regard to the Lutheran Heritage violations, which were the direction not to visit areas of the facility to which CNAs weren't assigned, also the direction not to wear union scrubs, it's clear that the ALJ and subsequently the Board affirmed that those violations were found on, in the first instance, regarding the visitation rule, all three prongs of Lutheran Heritage, regarding the union scrubs violation, prongs one and two of Lutheran Heritage. Why does Lutheran Heritage even apply to the scrubs situation if that's explicitly anti-union conduct? I don't really understand why the ALJ deployed Lutheran Heritage there. Right. So the idea is that Lutheran Heritage is supposed to apply to rules that are facially neutral. And I think your point is that it doesn't seem facially neutral to say you can't wear union scrubs. That seems to expressly basically prohibit union activity, so you can just bypass the Lutheran Heritage analysis altogether. In fact, Mr. Marr actually made this comment. You might have noticed in his — in one of the footnotes. I think that — I think the basic idea was that it could — it was litigated this way, I think, in order to touch upon the fact that it wasn't necessarily directed exclusively at union scrubs. It might have — in this instance, that's how it was expressed. But it might very well have covered other types of, you know, variations on scrubs. And I think that also because it was promulgated allowed the ALJ to sort of put it into that framework and say, well, you have a restriction on the logos and colors that were normally worn with regard to scrubs, and also it was promulgated at this time. But I understand that you probably could have litigated this on a different theory. That's probably correct. But it was litigated this way here. But in any case, undoubtedly promulgated in response to union activity, violation of Lutheran Heritage Prong 2, and that prong remains good law. With regard to the, you know, piggybacking on that with regard to the other violation involving union scrubs, the employer — McArden makes a big deal about the fact that this was third-party coercion. There's no such theory under 881 of the Act. It's not necessary to specify which employee was coerced. If you — if an employer engages in a course of conduct that would tend to reasonably coerce any employee, that's good enough to find a violation. So is that your argument responding to Counsel's Bellagio point, that he's saying we were sandbagged, that you switched the theory? Well, I think the Bellagio point was raised more with regard to the posting violation. So he raises the issue of Bellagio twice. So the first one is with regard to this instruction to a janitor, Andreas, telling him you have to take off union scrubs. And our position here is that that — the complaint entirely covered this found violation. The complaint, if you look at JA10, it says, you know, by Juanita Harmon, on or about July 15th, instructed employees not to wear scrubs with the union logo while allowing employees to wear other logos and insignias. The found violation was the employer violated 881 by instructing Andreas with a nearshot of Holcomb to take off the union scrubs and wear instead a pro — wear instead pro-union attire. The complaint doesn't say Andreas. The complaint says employees. And so in our — from our perspective, the Bellagio issue doesn't come up at all with regard to that Andreas union scrubs violation. That was completely contained. With regard to the second violation, the posting violation, so Bellagio was a bit different because what happened there was in Bellagio the employer was charged with a rule violation. There was no evidence of a rule violation at trial. And, in fact, it was contrary evidence. The ALJ found a rule violation nonetheless. And then the board overruled the ALJ and found a coercive statement violation. And what this Court said in Bellagio was that this, you know, the entire aim of the general counsel's case at hearing was that this was a rule violation. The employer had no notice at the hearing that they might very well be held liable for a coercive comment violation. By contrast here, what happened was, and the ALJ talks about this at great length, from the very beginning, the GC's theory was that Meck Arden was disparately enforcing his posting violation. Against pro-union literature. And so the charge is selectively and disparately prohibiting the posting of pro-union flyers while permitting the posting of anti-union flyers. And the evidence wasn't that there was a permission of posting anti-union flyers. The evidence was that there was permission of posting other flyers. That's correct. And you're saying the evidence, you know, came in, Meck Arden had a full opportunity to cross-examine, mobilize your problem. Cross-examine and also bring rebuttal witnesses, which they did. So in the course of that trial, yes, you're correct, the ALJ basically says this was a very inartfully drafted complaint. But whether Meck Arden had notice was a different question, because from the very beginning, the general counsel is bringing evidence that is all about whether or not there was disparate treatment regarding pro-union postings and non-union postings, the Avon postings, the Bake Sale, the Potluck, all that. So on surveillance, an employer is permitted to surveil its employees 24-7. I mean, in a situation like this where you have nurses and you're dealing with people who are fragile, you can have security cameras throughout the facility, no? Yes. But with regard to that impression of surveillance violation, the key issue is, you know, whether an employee would reasonably assume from an employer's statement that his or her union activities had been placed under surveillance. And here you had this change that the employees had been under the impression that the internal cameras at the facilities had been turned off for a long time. They had been turned off for two years. They had been turned off for months outside the facility. Then suddenly you have this incident wherein Hernandez tells CNA Dangerfield, these cameras are back on, you better watch out, they're recording your conversation. Opposing counsel is absolutely right that the cases that the Board cites regarding surveillance are factually different, because this is a very factually unusual case. In the cases cited by McArden, it is often the case that employers were told that the employee – that the employer had known about the employee's union activity. Here it's a very different set of facts, but the fact – the crucial legal principle remains the same, that if an employee – that if an employer makes a statement that would tend to create a reasonable assumption on the part of the employee that they're being surveyed, that is a violation under the Act. And with that, I press unless there's any questions. All right. Thank you. Thank you. How much time does Mr. Baskin have? Okay. I'll try to come in with that. First, let me answer your question about where in the record is the reference to the two or three times a month visits from Mr. Mettler, Joint Appendix 180. And 179. I found it. Thank you so much. Okay. Then we – referring to some of the statements made by opposing counsel about the instructing employees allegation and Andre the janitor, as it were, how can an allegation of instructing employees apply to someone who the employer person does not know is there? And in looking back at Ms. Holcomb's testimony, she doesn't say she was instructed. She says she overheard the management representative instructing someone else, a bit of a credibility, patently insupportable argument because of the fact that this other person, undisputed, does not speak English. So how could she overhear her instructing him in English? But regardless of that, we have a situation where she herself was not instructed. No one – it occurred to no one during the hearing to even address that issue further or to defend. The employer had no opportunity to defend itself against this wild claim that the judge eventually came up with. And similar with the job posting issue, the postings on the bulletin boards, when the testimony is coming in, when one reads the record – I didn't do the trial, but when you read the record and you see that statements are being made that are not the case. It just shows that there's no violation according to what was alleged. Nowhere did the general counsel amend the complaint. Nowhere during the course of it did the judge say, well, now there's a potential other allegation here. It's exactly like Bellagio, in which this oral rule was don't discuss discipline. And they wound up saying, well, that's not proof that there was an oral rule, but we're going to call it coercion of forcing, coercing someone not to discuss discipline. That's something that this Court has said is unfair to employers, violates due process. If they have a complaint, prove the complaint. They have the ability to amend the complaint during the hearing. They didn't do any of those things. They blindsided the employer on at least those two allegations. We've, I think, made our points about the other issues. We ask that the case be denied enforcement. Thank you. Stand, please.
judges: Henderson, Pillard, Edwards